# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| In re: | ) | Chapter  12 |
| | ) | Case No.  13-03176-dd |
| Ryan Evan Pressley | ) | |
| | ) | ORDER DENYING CONFIRMATION |
| Debtor. | ) | AND DISMISSING CASE |
| ————————————— | ) | |

THIS MATTER is before the Court to consider confirmation of Debtor's chapter 12 plan and on the motions of AgSouth Farm Credit, ACA (AgSouth), Jones Farm LLC (Jones), and the chapter 12 trustee (Trustee) to dismiss the case with prejudice. Farm Services Agency orally joined in the motions. A hearing on the motions to dismiss convened October 3, 2013 and, after consuming the afternoon, was continued to October 15th , the date set for considering confirmation. Testimony and exhibits were received. Confirmation of the modified plan filed October 3, 2013 is denied as the plan is not feasible. The case is, in light of the failure of this second reorganization effort, dismissed because of continuing losses and an absence of a reasonable likelihood of rehabilitation. The dismissal is without prejudice.

## FACTS

Debtor is a young farmer. He grew up with parents in the wholesale produce industry and grandparents who farmed. Debtor knows the meaning of hard work and dedication. He grew up playing baseball and excelled, ultimately drafted by a Major League Baseball team. After a stint in professional baseball he decided to farm. He owns, subject to liens, a 117.54 acre farm in Lexington, S.C. that was acquired from his grandparents, a 256.41 acre farm he purchased from Jones, and a residence in Martinez, Georgia. Debtor's parents live in the Martinez residence and are supposed to pay rent. Debtor now plans to join them and make this his home as well. He owns farm equipment valued at nearly $130,000.00 and leases

other equipment. Debtor transitioned cattle and turf operations into what is now primarily a

vegetable row crop business. In the five previous years he farmed he has not made a profit.

The current farm year has been a disaster with too much rain and resulting ruined crops.

Debtor previously filed a chapter 12 case (12-02757-dd) on April 30, 2012. That case

was dismissed after confirmation of a modified plan was denied and the debtor failed to file a

further amended plan within the time set by the court. The case was dismissed November 7,

2012. Thereafter secured creditors moved to foreclose mortgages and claim and deliver

personal property collateral. The present case was filed May 30, 2013 in order to avoid the

sale of collateral by the lenders. AgSouth filed a motion to dismiss on August 13, 2013 and

was joined by Trustee. Debtor filed a plan on August 28, 2013. Jones filed a motion to

dismiss September 9, 2013. Debtor objected to the motions to dismiss and the creditors

objected to the plan. After a pre-confirmation conference with Trustee and the creditors,

Debtor proposed an amended plan on October 3, 2013. The amended plan did not draw the

concurrence of the creditors or Trustee.

Debtor's initial plan proposed in this case called for a 2013 annual payment to

creditors through Trustee in the amount of $82,044.45 with subsequent payments of

$178.954.04 each year for four years. This was premised on gross farm income of $722,350

and net income of $126,210 in 2013 and net income projections of $203,285 in subsequent

years. As noted, the 2013 crop year has been a disaster for Debtor. He filed an amended plan

on October 3, 2013, the day the hearing on the motions to dismiss commenced.

The amended plan provides for the surrender of the Lexington County farm (subject

to the AgSouth lien) and retention of the other assets. It provides for a 2013 payment of

$55,588.05 (applied to interest on secured claims) and four subsequent annual payments of

$112,289.90. The secured debt to Jones on the Barnwell farm is amortized over a period of 15 years with the first payment beginning in January 2015. The AgSouth second mortgage on the Barnwell farm is valued at $0 as is the Farm Services Agency second mortgage on the Lexington farm. The AgSouth and Farm Service Agency liens on farm equipment are each valued and paid over a 7 year term beginning in January 2015. The arrearage to Wells Fargo on the Martinez, Georgia residence is to be paid over a 5 year period with ongoing mortgage payments paid directly each month beginning in October 2013. Priority tax debt to the Internal Revenue Service and ad valorem tax debt to various counties (or in reimbursement of tax advances to secured creditors) is addressed. Unsecured creditors, including the deficiency claims of AgSouth and Farm Services Agency, receive an annual payment of $16,386.64 plus any other disposable income available as calculated by Trustee and Debtor in January 2015, 2016, 2017, and 2018. Debtor also proposes to "assume" farm equipment leases between his grandmother and John Deere Credit.

Debtor lost money on the farming operation in each of the past 5 years. Ag South Exhibits 2 and 3 a – d reflect ongoing losses as follows:

| | |
|---|---|
| 2008 | ( 33,697) |
| 2009 | (118,178) |
| 2010 | (304,832) |
| 2011 | (233,294) |
| 2012 | ( 37,762) |

In only one of the years was interest paid to secured creditors and testimony showed that the interest payment was funded by a loan from Farm Services Agency. Debtor testified that the losses were moderating as he transitioned to a row crop operation and suggested that he would realize a profit in 2013. He now projects 2013 gross income of $214,400 and expenses of $147,068.60 leaving $67,331.40 to make the plan's proposed $55,588.05 interest payment.

This is a far cry from the $722,350 gross farm income projected with the August, 2013 plan and the testimony and exhibits reveal that even this reduced projection is not realistic.

Debtor introduced Exhibits A – P, photographs of crops in the field at the Barnwell farm in 2011, 2012, and 2013. The 2013 crop photographs (D – P) reflect initially flourishing crops but reveal extensive rain damage and deteriorating crops (D, E, F, M, O, and P). Even with the dire picture painted of crops ruined by the rain, Debtor projects (attachments to Exhibit S) a final quarter of the year with sales of $132,000 from 20 acres of collards, $30,000 from 18 acres of peanuts, $12,800 from the remaining 10 acres of okra, and $36,300 from 6 acres of cabbage. Debtor also projects the receipt of $43,300 in crop insurance and farm program payments. He projects another $132,000 in receipts from the sale of collards grown on the 20 acres in January and February 2014. Debtor testified that he would recover 50 to 75% of his lost and rain damaged crops from the crop insurance claim. This potential recovery does not reconcile with the initial or subsequent estimates of net farm profit.

AgSouth's special assets manager testified that he inspected the farm fields on October 2, 2013. At the October 3rd hearing, he projected gross sales from growing crops totaling $106,922. AgSouth also introduced a series of photographs (Ex. 12-25) taken the day before the October 15, 2013 hearing.  The photographs lend credibility to the lower projected income figure.  Exhibits 13, 14, 15, 18, 19, and 21 especially highlight the poor yield from the fields and the Court finds the AgSouth testimony more credible and believable as to the issue of 2013 farm income. At the October 15th hearing, the witness testified that, based on the visit at which photographs were taken and a recalculation of growing crops actually in the ground that gross income for the final three months of the year would be at most $60,000.

As to the future operations proposed by Debtor, testimony revealed that his father had loaned significant sums (between $60,000 and $70,000) to finance the farming operation since the filing of the bankruptcy case. The creditors complained that none of the advances of credit were approved by the court and that Debtor and his father were inconsistent in describing the funds alternately as a loan and a capital contribution. The testimony also was inconsistent as to the terms of repayment. Debtor testified that he had no other source of operating funds. Without the operating loans from the father Debtors operational losses to date as reflected in monthly operating reports filed with the court would be significantly greater. (Exhibits 7 a – c)

Father and son testified that future credit would be available; however the father refused to answer questions about the source of the funds and would not identify the detail of his own obligations to repay borrowed funds or his ability to acquire additional funds. He simply stated that the funds came from a loan the father received from a friend that was secured by property of another friend. In short, with the 2013 crop failure, a lack of funds to carry over to farm in 2014, and the peculiar hesitancy of the father to answer questions, there is no evidence of any ability of Debtor to fund or obtain credit for ongoing farm operations. Debtor did testify that much of his difficulty in past years arose because he had no operating capital or that operating loans were not properly timed to the cash flow needs of the farm operation.

Apart from these findings as to the gross and net income of the farm, testimony showed the following:

1.  Debtor sold a trailer valued at approximately $2,000 that had been under lien to AgSouth and did not pay the proceeds to the creditor. Debtor testified that the

purchaser is willing to return the trailer or pay $2,000 to AgSouth. Debtor also

testified that he had earlier remitted $2,000 to his attorney to hold for AgSouth.

Those funds have not been located. The alleged remittal to the attorney was not

reflected in Debtor's monthly financial reports to the court. The inconsistency in

claiming a previous remittance to counsel and the purchaser's willingness to now

pay the funds has not been reconciled.

2.  In the interim between the two bankruptcy cases, Debtor or his father paid

    unsecured claims of two individual creditors, one of whom was identified as a

    girlfriend of Debtor.

3.  Except as noted immediately above, the difference in the debt reflected in the

    schedules attached to the first and second bankruptcy petitions largely results

    from duplication of some entries, omissions of other creditor information,

    miscalculation of indebtedness and the accrual of interest.

4.  Except as noted in the number paragraph 1 above, the difference in the value of

    property reflected in the schedules attached to the first and second bankruptcy

    petition results from the use of different appraisals, crop losses, and changes in

    opinion as to value.

5.  The father is a co-maker on the Jones loan which is due December 1, 2013 and

    exceeds $585,000.

6.  The AgSouth loans total in excess of $1,280,000. These loans are guaranteed by

    Farm Services Agency and some estimated loss adjustments have been paid by

    Farm Services Agency to AgSouth. Ag South remains the servicer for the loans

and collects the debt for itself and Farm Services Agency as their interests may be adjusted from time to time.

7. Debtor's past financial projections have never been achieved and he attributes the farm failures to a combination of the absence of timely available operating loans, natural disasters, and "some fault" attributable to himself. Debtor attributed some of the difficulty in obtaining operating loans from agricultural lenders to animus relating to his race and youth. Debtor had previously testified that the reasons lenders had given him for their hesitancy to provide him crop loan advances was that he had insufficient collateral and that there was a concern with his level of farming experience.

8. Debtor's present agriculture projections are based on his past operations and on yield projections available from the state agriculture service.

9. Debtor's father testified that he did not expect to be repaid his operating loan to his son until his son's creditors were paid.

10. Both the AgSouth manager and John Paul Jones on behalf of Jones testified that the Debtor's Barnwell County farm was or, based on results, must have been mismanaged. According to Jones, the farm has center pivot irrigation, excellent soil and a history of top yields for turf. He testified that there was no reason, other than mismanagement, that the farm would not produce yields that would allow Debtor to make a living farming. AgSouth's witness stated that the current farming practices of Debtor were inept.

11. The monthly operating report for August 2013 reflects end of month cash on hand of $13,983.21 following losses of $11,881.04 for the month. Debtor testified that

his cash situation for the year would have been negative but for the loans from his

father. Although the September 2013 report was not available at the time of the

October 15th hearing, Debtor also testified that the end of month cash on hand as

reflected in his updated feasibility analysis, based on the September cash on hand

would be approximately $6,100. This reduction in cash between August and

September reflects another month of operations at a loss.

CONCLUSIONS OF LAW

Although the hearing on the motions to dismiss was commenced first, it merged,

with the agreement of the parties, with the issue of confirmation due to time constraints.

The issue of confirmation is addressed first. Debtor has the burden of proof by a

preponderance of the evidence to show that the plan should be confirmed. A plan must be

confirmed if it meets the standards of 11 U.S.C. § 1225(a).[1] The creditors and trustee

variously argue that the plan is not proposed in good faith, is not feasible, does not meet

the chapter 7 liquidation test, does not meet the best interest of creditors test (present

value), and is otherwise deficient.

The multitude of issues raised by the creditors and the volume of evidence on

good faith and liquidation need not detain the Court as the plan simply is not feasible.

"Section 1225(a)(6) requires the court to find that the debtor will be able to make all

payments under the plan and to comply with the plan." 8 *Collier on Bankruptcy* ¶

1225.02[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010)[hereinafter

*Collier*]. Courts often resort to cases construing the similar feasibility requirements of

chapters 11 and 13 of the Bankruptcy Code when faced with the issue of feasibility in a

chapter 12 case. "The court should not confirm a plan unless it appears under the totality

---

[1] Further reference to the Bankruptcy Code will be by section number only.

of circumstances that the plan has a reasonable likelihood of success." *In re Harrison*,

203 B.R. 253, 256 (Bankr. E.D. Va., 1996)(a chapter 13 case). "[S]uccess of a debtor's

plan does not have to be guaranteed; instead, the plan must 'present a workable scheme

of organization and operation from which there may be a reasonable expectation of

success.'" *In re Om Shivai, Inc.*, 447 B.R.459, 462 (Bankr. D.S.C., 2011)(in a chapter 11

context)(citations omitted).  In assessing feasibility, several factors may be relevant,

including:

> The reorganized debtor's capital structure, the debtor's projected earning
> power, the current state of the economy, the ability of management and the
> likelihood that the current management will continue to work for the
> reorganized debtors, and any other factors the court finds relevant to the
> success of the debtor's plan.

*Id*. (citing *In re Radco Props., Inc*. 402 B.R. 666, 679 (Bankr. E.D,N.C. 2009).

Merging the factors which Courts look to in the more complicated chapters 11 business

cases and the sometimes simpler consumer 13 cases is often necessary when considering

the feasibility of a chapter 12 plan proposed by a family farmer.

    Debtor has shifted his farming operation to his preferred choice as a vegetable

farm. During the past he has not made a profit, not once. His operation during the

previous chapter 12 case lost money and it is now losing money. The present year

projections for gross income are not being realized and even the last minute revisions of

the income projections are not realistic. The photographs of the crops growing on the

farm at the time of confirmation paint a far different and more dismal picture than Debtor

projects. Debtor has the burden of proof on feasibility and is far short of it. Without

further operating loans, Debtor cannot pay his first (interest only) chapter 12 payment and

have funds to plant next year's crops. Without a fulsome planting schedule, Debtor

cannot make his projected yields for subsequent years. His father's testimony concerning

an ability to continue to fund operations is simply not credible. Father refused to testify

concerning the source and availability of money and the court infers that the funds are not

in fact available. Additionally, father's own financial circumstances and the looming

default date on the Jones debt, with its potential impact on father, do not support Debtor's

cause. While family farmers may, from time to time, receive loans from family members,

"[a] debtor relying on such financing will have to demonstrate that the financing is

reliable to establish feasibility." 7 *Norton Bankr. L. & Prac*. 3d §134.12 fn10. The

evidence of the reliability of ongoing financing is not convincing.

Turning to the motion to dismiss, the creditors again serially argue unreasonable

delay and gross mismanagement, continuing loss to or diminution of the estate paired

with the absence of a reasonable likelihood of rehabilitation, and bad faith or other cause.

The case should be dismissed because Debtor continues to operate with no profit and

rising debt because of the inability to pay secured creditors even their interest. There is no

prospect for rehabilitating the farm operation. The debtor has had an adequate

opportunity to confirm a plan in two chapter 12 bankruptcy cases and failed to obtain the

court's approval. "If the debtor has tried but failed to obtain confirmation of a plan . . .

the debtor should bear a greater burden in showing that the debtor has reasonable

prospects for rehabilitation." 8 *Collier* ¶ 1208.03[9] (16th ed. 2010).

Debtor does not have the cash flow to make the plan payments and does not have

operating funds. Even with the surrender of the Lexington farm, the existing cash flow

will not support Debtor's revised plan. This is true even though the initial proposed plan

payment covers interest only and is thus perhaps inconsistent with the payment of the

present value of the secured claims in a realistic timeframe. Additionally, based on

Debtor's own numbers, creditors will receive the same value under the proposed plan as

they would in liquidation. However, liquidation would not take 5 years. It is questionable

whether this is consistent with § 1225(a)(4).  In sum, losses continue, debt builds, and the

farm will not successfully operate considering the level of debt and realistic income that

can be generated under the present business model. The Court does not find gross

mismanagement on the part of the debtor, and this and the previous case have proceeded

in due course with Debtor attending to the duties imposed by the Bankruptcy Code.

While there have been delays in reporting and correcting information, these delays do not

arise to the level of unreasonable delay or bad faith. However, the case should be

dismissed under § 1208(c)(9) because of continuing loss to or diminution of the estate

and the absence of a reasonable likelihood of rehabilitation.

    The creditors have asked that dismissal be with prejudice as to filing any

bankruptcy petition for a period of at least one year. In connection with this request, the

Court has considered the bad faith objections to confirmation put forward by creditors.

Dismissal of a bankruptcy case is ordinarily without prejudice to the filing of a

subsequent case. "Unless the court, for cause, orders otherwise, the dismissal of a case

under this title does not . . . prejudice the debtor with regard to the filings of a subsequent

petition under this title, except as provided in section 109(g) of this title." § 349(a).

Section 109(g) is not applicable. The court then turns to whether cause exists for barring

a filing by Debtor for some period of time.

    Debtor has, following loan defaults, twice stopped creditors from pursuing state

law remedies in collateral by filing bankruptcy petitions. Section 362(c)(3) provides no

relief from or limitation to the automatic stay in a subsequent chapter 12 filing. The one

year window of § 362(c)(4), applicable to a third case filed under any Bankruptcy Code

chapter when two or more cases were pending by the same individual debtor in a one-

year period is set to expire at or near the time this order is entered.

Our Court of Appeals has recognized under § 349(a) dismissals with prejudice to

a subsequent discharge and dismissals with an injunction to re-filing both for "the 180-

day period provided by § 109(g) or a longer period." *In re Tomlin*, 105 F.3d 933, 939 (4th

Cir. 1997). However, courts generally do not dismiss bankruptcy cases with an injunction

to re-filing absent evidence of egregious conduct demonstrating bad faith. *Id*. at 937. In

*Tomlin,* the decision of the bankruptcy court to dismiss a case with prejudice to re-filing

for 180 days was affirmed following a serial bankruptcy filer's sixth bankruptcy petition

and the failure to attend the creditors meeting and file schedules. *Id*. at 935, 941-42. This

does not suggest that a sixth filing is a minimum standard for considering a time-period

injunction to future filings, but does point to the need to employ this type remedy only in

the appropriate case.

The Debtor has not engaged in egregious conduct demonstrating bad faith. He has

twice availed himself of chapter 12 relief in hopes of reorganizing his financial affairs.

While he has been slow to file written amendments to his schedules he has filed the

schedules and has been truthful in connection with a series of examinations under oath.

The information necessary for progress in the case has been available, though perhaps

Debtor and counsel could have been more attentive to ensuring correction of the written

record. The inconsistencies in connection with testimony concerning the trailer and issues

with the father's reluctance to testify concerning the source of the operating loan are

troubling but do not alone justify dismissal with prejudice in this case. Creditors have not

availed themselves of the option to seek relief from the automatic stay in this or the

previous case. Clearly the findings in this order would have a bearing on a motion for

relief from stay or a motion to dismiss a subsequent case with prejudice were such a case

to be filed without significantly different circumstances or goals. Dismissal is without

prejudice.

CONCLUSION

Confirmation of the plan is denied and the case is dismissed. The Court retains

jurisdiction of the case to consider the application for compensation filed by counsel for

Debtor.

IT IS SO ORDERED.

**FILED BY THE COURT**
**11/14/2013**



David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 11/15/2013